Case No. 11-2321, Home Star Bank & Financial Services, guardian of the estate of Edward Anderson & Owell v. Emergency Care & Health & Owell. If both attorneys that are going to argue, please step up and identify yourself for the record. Good morning, Justices. Keith A. Bison for the Appalachian Home Star Bank. Good morning, Your Honors. Chris Silva, S.O.L.A. Finnegan on behalf of Dr. Michael Bertini. All right. Before we proceed, I just want to advise both of you, you will have approximately 15 minutes for your presentation. And from that, Mr. A. Bison, you may save up some time for rebuttal. I would like to save a few minutes for rebuttal, please. Thank you, Your Honor. All right. Good morning again. Keith A. Bison on behalf of the Appalachian Home Star Bank. We respectfully suggest to this Court that you have a question to answer here, and it's whether this case is reversed outright or whether it's reversed for remand with further proceedings. And I'm going to take the latter first. Is that the order in your brief? Well, I don't remember the order of the brief. I've gone off my notes. Isn't it because the first issue in your brief is a good faith question? Correct. Well, and the fee, which there's an interaction with that before we get to the outright reversal. We believe there's genuine issues of material fact in this case, essentially involving a situation where you have an emergency physician who is providing emergency care, which is his job, and he's being paid for that, and on both the issues of the without fee and the good faith aspect. As your Honors know, this is a de novo review, and that summary judgment is a drastic remedy. Dr. Murphy, no question, is an emergency room physician. That's all he does. That's all the company does that he was employed by. He responded to the code. He admitted in his deposition it was part of his job to respond to the code. You know, there's other information here where other people are questioning that, but he himself admitted that was part of his job. That's corroborated, quite frankly, by the policy and procedure of the hospital as the practice of the hospital. It was corroborated by the president and CEO of the hospital, Paula Jacoby. It's corroborated by the testimony of other people who were present at this code. So this was part of his job. He was not a volunteer. This was not a generous or compassionate act, and although there's no bill in the record, Dr. Murphy was not in a position to send a bill because he was not the person who would do the billing. And he never sent a bill. Well, he never sent a bill, and apparently nobody sent a bill. But the one thing about Dr. Murphy is, according to Dr. Dana, who's the president of ECHO, Dr. Murphy's employer, that the emergency room physician who was involved, in this case Dr. Murphy, could request that a bill not be sent by ECHO if the family or the patient was unhappy with the outcome. And we definitely have a case here where you would be unhappy with the outcome. And I'm going to come back to that in a moment in terms of the inference that could be drawn by a jury, which would preclude summary judgment in this case on the issue of good faith. As far as the – there is evidence in this case that there was no discussion ever that there was not a practice, as it was suggested by Appley, that they would never bill for codes outside the emergency room. There were some people that said that, but Dr. Paula Jacoby, who had been the CEO of that hospital for a long time, who was involved with these contracts, specifically said she was never informed of that. And they didn't have any written policy or procedure to that effect. ECHO didn't. And there was never any discussion with the billing company that would bill for ECHO that that was the practice. So the jury is left here with a situation where they can assess this evidence, draw whatever conclusions they want about that, and inferences have to be drawn – have to be allowed to be drawn in plaintiff's favor on a summary judgment matter. So under the Hernandez case, the Muno case, the Heen, if I'm pronouncing that correctly, case, and the Seventh Circuit Rodas opinion, all of those cases stand for the proposition that, in this case, summary judgment would be inappropriate. If you just look at the good faith aspect of this, that that's a jury question that should be decided for the jury, and the trial court should not have granted summary judgment just on that basis. And I want to turn to the reversal outright, which is the second part of our argument. And I want to point out, if it isn't clear from what we've submitted to the court already, this is the first case that has ever been in the appellate court system where there is an emergency room physician whose job it is to respond to emergencies, who's being paid to do exactly that. Where the Good Samaritan Act has ever been invoked. And I say that for a template of discussing what I think is clear from the legislative history in this case, with this statute, that no way was that the intent of this statute when it was originally passed or at any time it was amended. In fact, specifically, it's in the briefs, there's discussion about on the streets of Illinois, at the scene of a motor vehicle accident, if someone falls down the stairs, and if it's not in the doctor's office or in the hospital. Those are the words of the members of the General Assembly in the legislative history, to the extent there is any, about why we have this statute. Well, I think that those comments are certainly important. But when they incorporated the language that they chose, they kind of seem to have gone off on a different path. Wouldn't you agree? The language talks about, you know, exemption from civil liability for emergency care. And then it says, you know, it doesn't say anything about volunteering. That word's not here. And then it says, you know, any physician or person licensed to practice medicine, rather, provides emergency care without fee, who in good faith provides emergency care without fee. The words they chose certainly don't seem to match at all with what their stated intent was. Correct. But I accept that. We wouldn't be here having this discussion if we couldn't say that. I understand. I have two responses to that. One is that if you look at the cases that we cited, Your Honor, and I mentioned the ones that essentially are the main ones we're relying on, those courts have noted this as well and noted that the second part of this is the absurdity in this case of somebody whose job it is to respond to emergencies that has the ability to manipulate the billing mechanism and take yourself off the hook is an absurd result that the legislature could not possibly have intended, no matter what words they used in the statute, when the statute was passed and when it was amended. And that goes back to the good faith thing, by the way, in terms of the summary judgment issue, in terms of at least a remand for further proceedings to allow the jury to decide that question. How do you suppose these cases got so off track? Because isn't your stronger position the one you're arguing now? Don't you believe that the statute was never intended to apply to a doctor working in a hospital who's required to be there in the emergency room and then has an obligation to respond to the code blue, that this was never the intent? I do believe it's a stronger argument. The answer to your question, and it's in our brief, is the history of how this ever got started in the courts, despite the legislative history, was that they just took off on this. It was just developed in the case law, but what's happened in the case law, if you follow the case law all the way up to the Seventh Circuit Rojas opinion, is the courts are starting to look at this more carefully and think about it more carefully and realizing that the initial reaction to this, if you blindly just take the words and apply them without using any legal reasoning or judgment, that doesn't fit the reality, especially the way medicine is practiced now. Because when the Good Samaritan Act was first passed, we had direct billing. That was how the practice was run. As was pointed out in our briefs and in many of the cases that we cite, that's all changed. You have a system here where the guy who's providing the care wasn't the guy who would send the bill. There was a company he was employed by that delegated that responsibility to a third party. And so this is not the same world we even live in. And I think that was pointed out clearly in the Rojas Seventh Circuit opinion. So I believe this is the stronger argument. And in this case, we're just arguing about an emergency room doctor because that's the most extreme observed application of this statute. I guess it could be left for another day whether if your honors believe that in this situation it's an outright reversal or wasn't intended to require this situation, whether that goes broader and would apply to anybody in a hospital who's being paid to be there to do their job. Well, under your logic, would the emergency room doctor, if he ran outside the hospital and ran across the street to help a car accident victim, would it still apply under Good Samaritan even though he's getting paid? Well, he's not getting paid to run outside of the hospital. Now, one of the cases, and I don't recall which it was, I'll attempt, one of the cases that's in the briefs is a case where the doctor was out in the parking lot and trying to take care of somebody in a car. He was not in his emergency room. But that doctor was off duty. I don't remember if he was off duty. He was leaving the hospital. That is a closer reality to what the intent is of the statute. It was intended to protect people, as I said, on the streets, where the doctor doesn't have, you know, all of his facilities and everything. I thought in that case the patient was being moved from one facility to another. But it happened in the car. It didn't happen in a facility. And that doctor was trying to intubate this patient with what I would call crude or primitive access to equipment and everything. And that was the spirit of what this was intended to cover, at least arguably, is that he's not doing his job in his normal environment where he has all the benefits and the things that he's supposed to have to be able to do it. That was Hensley. It was Hensley. I just couldn't recall offhand. In the parking lot. Right. And Hensley is the case that first got on this good faith thing. You've got to look at the good faith thing on the billing. And then specifically talk about this is meant to protect volunteers, not people being paid to provide the services. That's when this started developing the case laws. Let's take a closer look at what the real intent of the statute was, not blindly apply words without using legal reasoning. Well, we go behind the language when the statute is ambiguous. When the language is unclear, then we look to what the legislature intended. You would certainly have to argue that this language is ambiguous because, well, I mean it is if you're interpreting it your way, exemption from civil liability for emergency care. I think your opponent will argue that if you look at just the title, there's a suggestion about emergency care. And I think the first thought that comes to mind is emergency care is in emergency rooms. So I'm just saying that to get to the intent, we do have to at least conclude, don't we, that this language is ambiguous? Well, certainly the without fee part is ambiguous, and the courts before this court have specifically said that. That's the developing case law is that the without fee is definitely ambiguous. Yeah, well, I mean emergency care. I'm not sure whether that's clear either, since you could certainly interpret it two different ways. Well, and that goes back to, I think you'd back into it from the absurd result. The absurd result that a doctor who's working in a hospital whose job it is, all he does is take care of emergencies because there's not a bill sent by a two-party removed provider benefits from this statute. And that's where you do have to look a little bit at the intent. That's an absurd result, and it's absurd if you look at the legislative intent. It's absurd if you just use common sense. He could have done the same thing. What if he was in the emergency department and they decided not to send a bill? Could anybody really say that that should be covered by the Good Samaritan Act? That way, anytime there's a bad outcome in a hospital, all you have to do is not send a bill, and you're immune from negligent acts. That's absurd, and that's exactly what they're arguing in this case. I think it's dangerous to try to analyze this by way of geography. I don't think the way to resolve this issue is by asking where is the doctor. So, for example, is he in the emergency department? Is he in another department? Is he in the parking lot like in Hensley? I'm not sure that that's where the issue lies. I think the issue lies in the dichotomy that the cases have set out in terms of when you define for a fee, does that go both ways? Does it go to a bill coming from the doctor or the doctor being paid? That's really the issue. I don't think it has anything to do with geography. As long as there's a duty to ask. So, to take it one step further, if you say it also includes that second interpretation, doctor being paid, as long as when he runs into the parking lot like at Hensley, he's being paid for that. I don't think anybody can argue that. We all watch ER. The guy runs, they run out into the parking lot to bring the patient in. That's part of their job. So, I think that's where the question is. It's not geography. It's should we accept the, and I can't pronounce that case either. I pronounce it heen, but it could be heen you or. Do we accept heen and accept that it's just, is the billing coming from the doctor in one direction or do we accept Hensley and say, you know, there's another way to interpret the word fee and it is that he's being paid on an hourly basis or in this case per diem. I don't disagree with anything you've said, Justice. And I'm actually not the one making the distinction about the location, except the comment I made to Justice Taylor when he asked about, at least arguably, if you're in a parking lot taking care of somebody in a car, you're at least in the, you know, there might be an argument about that. Obviously, that's not this case. And I don't think in this hospital it makes a distinction whether he's in the ER or on the floor because according to the evidence in the case, his own admission, it was part of his job to be there and do that as a trained professional, emergency physician, to do those things. So the location, I agree, particularly in this case, is not an issue at all. He's in the hospital. That's part of his job. Even if you look at the title, I don't know that the good Samaritan notion was ever meant to apply to someone who was at work doing their job and being required to do these things. I don't think that even fits the traditional notion of what the legislature chose to call this statute. So, anyway, we'll certainly have questions for opposing counsel. Okay. Thank you. Mr. Sofa? Good morning, Your Honors. Good morning. Chris Sofa, as well as on behalf of Dr. Murphy. I guess I could start out if you guys want to start asking questions or I can go for some notes. We'll see where you go. I think that what we really need to focus on is just the language of the statute. And it's a long statute. There's many sections, but it comes down to approximately ten words. In good faith provides emergency care without appeal. Now, in my opinion, based upon what we have in the 18-volume record on appeal, there's absolutely no evidence in this record that any of the care and treatment that was provided by Dr. Murphy to Mr. Anderson on August 25, 2001 was ever billed for. Now, there's been lots of discussion back and forth in the briefs, as you're aware, about billing practices. But in all reality, in the contract between the medical service and the hospital, the medical service would bill for all of the services doctors provided to patients, regardless of the payer. It didn't matter who was paying.  Now, this is a situation where at the time of the care and treatment provided, the medical providers did a fee-for-service billing procedure. So in that regard, all of the services that the doctor would provide... Do you agree with counsel that this is the first time that this particular scenario is being confronted for purposes of an interpretation of the statute? That is, a doctor working in a hospital, assigned to the emergency room, responds to another patient in a code blue situation. There's no other case like this. Has anyone ever claimed before that a doctor working in the emergency room, responding to another situation in the hospital, is seeking the protection of the Good Samaritan Act? There's been similar cases. There's one case I know where there was a doctor that was on staff working in the hospital and responded to a code blue and was granted immunity under the Act. What case is that? That case is... And why was he given immunity? He was given immunity because he came to a situation where he was called out. He had no prior contact with the patient, even though it's not a requirement anymore. And he was called out of his normal environment, and he was not doing his job in his normal environment, which is outside of the emergency room in this particular case. But in that case, it was just another doctor who was called in, and he had to provide... What was the name of that case? I believe that one was Samoy D. Klein. Is it in your brief? It's cited within the Hensley decision. So it's not cited directly in your brief? It's not cited directly in my brief. It's cited as the file of the organs. But in any event, it was a situation where there was a response to a code blue, and there was an untoward result that there was no billing for the services that were provided, and also there was no evidence of it not being in good faith, so in bad faith. And based upon simply looking at the language of the statute, there was a situation where, in good faith, a physician provided emergency care in response to a code blue in a hospital, and it was without fee, therefore providing protection under the act. But Dr. Murphy was getting it settled. So even though it was a fee for each operation, he didn't get any more by doing five procedures versus just one. And I think that's an important point. Dr. Murphy's contractual agreement with ECHO in terms of his salary didn't matter if he responded to code blues or not. It didn't matter what he did. It didn't matter if there was no patients that ever came in that day whatsoever into the emergency department. It simply was he was being salaried. But the fact of the matter is that he is being paid. Because you have to look at the services that are being provided, the services that were provided by the doctor. Well, why are you getting that you have to look at the services provided? Why does it say that in the statute? Well, it doesn't say that in the statute, but it does say that. Well, do you think the language of the statute is ambiguous? I do not think it's ambiguous. Well, we're having a discussion right now about without a fee, what that means, whether it means the person's working or not working, whether they do the billing or somebody else does the billing. I mean, the cases obviously even suggest that there's some question about this. So how is it clear? I think it's clear in that, in this particular case, no fee was charged for the services that were provided by Dr. Murphy to Mr. Anderson on August 25th of 2001. Well, you know, I'm not sure if you know how to say this. I pronounce it heenoo. Heenoo? Okay. Well, heenoo said that. Heenoo said that not only does it have to be billed by the doctor, but it has to be for a specific service. And, you know, it seems to me that if you take the position that you're taking today, and that is that you have to read the statute as it's written, where does it say that? I don't know where the heenoo court came up with that, this additional clause for specific services, because that's not in the statute. So it seems to me that while, with all due respect, the heenoo court was saying, you know, this is clear on its face, we're also going to add this for a specific service. That's not anywhere in the statute. So, you know, it seems to me like you're on both ends of the stick here. Read it as it's written, but let's add this. Well, I think if we just focus on the language of the statute then. Dr. Murphy was called in in a code blue situation, which was not part of his normal situation in the emergency department. There's testimony in the record which shows that in a situation wherein a code blue would have been called and he responded to it in the emergency department, which happens at times as well, that there would have been specific patient billing for those services because it was in the emergency department. In this case, he was providing emergency care outside of the emergency department. He did so without fee in terms of there was never a charge for the services provided to Mr. Anderson by Dr. Murphy. And I also believe that there's no dispute that that was done in good faith, as there's absolutely no evidence anywhere within the record on appeal that that was in any way different from the normal practice of the way that they handled those types of situations. Well, let's get back to the language. Okay. The title is called the Good Samaritan Act. Sure. The first line refers to exemption from civil liability for emergency care. And then we have this other language about, you know, who in good faith provides emergency care without fee to a person. Now, if that language is fuzzy, which I think it is, about whether this was ever intended for people working in a hospital, I'm not sure. But what about the comments of those that created this piece of legislation and their comments that we're trying to exempt from liability, those people, doctors, that happen upon a situation outside the hospital setting, someone falls down the stairs, they're injured, and the doctor provides care. We're not going to impose liability on those except for their willful and wanton behavior. I mean, what do we do with that? It seems like that could have been an interpretation, a valid one. That's what they said they were intending when they created this act, because there's cases that have gone off in all sorts of directions. It doesn't mean that that makes this language clear, that it somehow is unambiguous. So what about their intent? What about those comments? Well, I believe that those are selected comments. I believe there's a long legislative history. I don't have the entire legislative history with me or before this court right now. There was only the cited sections that were pointed out in the briefs filed on behalf of Mr. Anderson. Well, I mean, don't you think that that alone suggests that this was never meant to apply to a doctor working in a hospital? No, I don't believe so. I believe that when you ever look at any legislative history of any statute, there's going to be comments made by numerous advocates for and against whatever particular piece of legislation is being put forth on that particular day. What would be the reasoning behind providing liability for a doctor who's working in an emergency room and is obligated to care for those patients in the emergency room? He's also obligated to respond to a code blue. Was there any dispute that that was his obligation to do? I believe there is. There was a dispute about his requirement that he respond to that? I thought the emergency room physician had to go to that code blue. Paula Jacoby, who's the CEO of the hospital, who was already referenced by counsel, has admitted that there's no specific requirement anywhere for an emergency room doctor to respond to the code blue. She just said that's just what she figured would happen. She just assumed that's the way it would work. There's no specific language in the contract between the hospital and the medical provider which required an emergency room doctor to respond to code blues. In fact, the policy that was cited by counsel is actually an admitted nursing policy and was also admitted by the house operations manager, Nancy Frizzell, to be applicable only to employees of the hospital. Dr. Murphy was not an employee of the hospital. I'm sorry, I didn't finish my point. Simply because Mrs. Jacoby assumes that emergency room physicians are going to respond to code blues does not necessarily make it so. In fact, there was also admissions by numerous individuals at Provina that, sure, if an emergency room physician is already attending to other patients in the emergency department and a code blue is called, he doesn't necessarily have to respond. Other situations where if there's already a physician on the floor, for instance, in an ICU, this particular instance happened overnight on a weekend where there was no doctors that were actually actively on the floor, but if there was already a doctor actively on the floor and they called the code, that doctor is going to respond to the code versus the intensivist versus having somebody from the emergency department come on up to the ICU. So I believe there's certainly a dispute that there's a specific question. Putting aside the dispute, what would be the reasoning, what rationale would there be for exempting liability for physicians working in hospitals? Give me a good reason to have that. Mr. Anderson, who's expecting patient care, where would be the logic behind your position that doctors working in hospitals, other medical personnel working in hospitals, somehow should be exempt from liability for their negligent acts? What's the reasoning behind that? The reasoning would be this. When a patient goes into a hospital, they're going to be assigned a medical team, so to speak. The medical team is going to adjust depending upon which area of the hospital they're in. When you're in the emergency department, the emergency room physician is going to be taking care of you and essentially responsible for your care. In this particular case, the patient had already been transferred to the ICU and actually at this instance had been transferred to the general medical floor when this instance occurred. At that point in time, you have a situation where the emergency room physician is responsible for the emergency department, and that's the environment that he's working in. He's not an ICU doctor. He's not a general medical floor doctor. So when he's called into an emergency situation, that's bringing him out of his environment where he is trained and is able to perform the duties that he's supposed to provide into a situation that he may be unfamiliar with, with a patient that he's unfamiliar with, in circumstances that are certainly ones that he would not have any general knowledge of or any prior knowledge of in terms of what was going on with that particular patient. Therefore, you're going in basically blind as the physician. And in that particular case, you would expect, you would hope if you were a patient, that whatever physician responds would provide the best care that they possibly could. However, in a situation such as this one where you're called out of the environment you're in with a patient that you have absolutely no clue about what's going on with, you're going to try to do the best you can. That's why the Good Samaritan Act is specifically in place so that doctors won't say, I'm not responding to that because, you know what, I'm busy in the emergency department. I'm not going to go up there and try to take care of a patient and then have something crazy go on that I'm not sure what's happening when I might not have any backup or anything else. No, you would expect. And you think that somehow we can glean this from the language of the statute? That was really the intent here was to start parsing out who's responsible and who can get exemptions from liability if they leave the emergency room and respond to a code blue? Absolutely not. What I believe, I was trying to state, is that the Good Samaritan Act is intended specifically for what happened here. For a doctor who comes in blind and be able to provide the best care he or she possibly could in a situation where it's not his environment and it's not his patient to be able to provide the care. It's the same thing if the doctor comes across a patient on the side of the road which has been brought up. The doctor doesn't have to stop and respond to that. I think the patient really gets the short end of the proverbial stick in that situation. If you're not in the emergency room and you're transferred to the ICU, everything's up for grabs now. Your care is out the window because this statute was meant to exempt a doctor who leaves his emergency room station and goes to assist in another area of the hospital. I don't know that we can gather that that's what the Good Samaritan Act was ever meant to do. Your client certainly has the privilege of being able to go to that room and respond to that code blue, right? He has privileges in the hospital. He does not have any privileges. He just has... He can practice medicine in the hospital. He can practice medicine. He has privileges to practice medicine in the hospital, and he's being paid, I think in this case it's per diem, right? No. Was it hourly? One or the other. He, I believe, was on an hourly, if I recall. Okay, so he's being paid hourly. He was doing 24-hour shifts. Okay, so he's being paid hourly. It was hensely that was per diem. Okay, so he's being paid hourly. He has privileges in the hospital, and a code blue goes off, and he goes and he responds. Is your client a volunteer? I believe he is because there's no contractual obligation that says that he has to respond to that. There's absolutely no contractual obligation anywhere. That's what I tried to point out in my briefs, was that there's a dearth of evidence to say that there's some type of actual obligation. Well, would this fit under that other situation, then, that this was a voluntary undertaking? I believe it was a voluntary undertaking. Well, then is he going to be held responsible? Are we throwing that out? Is that gone if he responds and he undertakes this voluntary... I don't understand the question. My question is, can he be held liable on another theory, that this is a voluntary undertaking? No, this is a situation where he went in. This falls directly under the Good Samaritan Act. He provided emergency care in good faith without fee. Without fee? Without fee. There was no fees charged for his services, absolutely not whatsoever. If he was being paid, how can we say this was without fee? Is there a question of fact on that? I believe there is not. He's being paid by ECHO. And then in terms of the actual fees for services, you have to look at that now. In the fees, there was no fees charged, no bills. There's a long line of testimony by Ms. Jacoby, Ms. Frizzell, and I'm blanking on the last one, in terms of a third person who would testify that the hospital never billed for these services. I think the person said he began with a D or something. Yeah, I know who you're referring to. Ms. Jacoby, Nancy Frizzell, and Loretta Clifford. Okay. I thought it was Dana, but never mind. Dr. Dana was the president and CEO of ECHO, who also confirmed that, you know, these are just the way they did it. This is the billing practices. They did not bill for physician services in response to code blues outside of the emergency room. Inside the emergency room is a different story. Well, if he's on the clock, then presumably he got paid for the moments that he was in that room responding to the code blue. Isn't that right? Yeah. I mean, during that passage of time, he was earning money. Isn't that right? He was being paid by ECHO, but I think that's not looking at what the situation is. We're talking about fee for services. You're talking about fee for services. The statute doesn't say fee for services. It just says fee. And my question to you is, if your client is being paid hourly, you know, he could be standing on his head, but he's getting paid. And so when he goes into that room and the clock is ticking, let's say there's a code blue and he enters the room at 1 o'clock and he's in that room from 1 o'clock to 2 o'clock, in the room working on this plaintiff. For that hour, that 1 o'clock to 2 o'clock, he was paid. And so why isn't that a fee? Plain and ordinary meaning of the word fee. It's been discussed in lots of the cases that we've cited, both of us, but pretty much all cite the same cases. And it applies only to situations where a patient is billed for the specific services the doctor provides. Where does it say that? That's in the case law. Well, it's in HIN-A. But the question today before us is, and the cases that HIN-A relied on, but the question before us today is, do we go along with that? Because, again, I mean, I don't want to repeat myself, but I will. You know, on the one hand, we're being told, you know, look at just what the statute says. On the other hand, we're being told fee means fee for specific services. Well, which one do you want us to do? You want us to look at exactly what the statute says, or do you want us to look at this additional clause for specific services? Because if we don't say for specific services, that brings me back to my scenario, that from 1 o'clock to 2 o'clock, he's getting paid for that hour. It was done without fee to the patient. Pardon me?  And so we're going to allow a manipulation, really, of the intent, to just say as long as you don't bill, as long as there's no specific bill, you're exempt from liability. That's where good faith comes in. That's been discussed in the case law as well. And I believe that that is how the model, that's how the, if you look at those 10 words that I've been talking about, in good faith provides emergency services without fee. So, yeah, if you try to manipulate it, that would be in bad faith, and then you don't fall within the statute. Well, you wouldn't admit that there's an ambiguity then? I don't believe there is. Okay, because you're saying to us it's without fee to the patient, and then you also said it's without fee for specific service. And my question is, if you want us to read into the word without fee, those additional phrases, haven't you introduced an ambiguity? Because now, I mean, how is ambiguity defined? Ambiguity is defined as, is there a reasonable alternative definition of the word? Is there more, I'm sorry, I don't want to misquote it. I think it's, is there more than one reasonable definition of the word? And so now we're hearing fee means fee to the patient, or fee for specific service, or we also know in the case law, at least in one court, it was money earned by the doctor. So there's three interpretations of the word fee. And without fee could also always be interpreted to mean that it doesn't apply in a hospital setting, because when people go in there, they're actually paying customers. You don't get hospital service for free. You are obligated. Whether you end up ever paying a bill or whether you get billed, when you go to a hospital, you're going there to get care, but you are supposed to pay for that care. So another reasonable interpretation is, is that this was never meant to apply in a hospital setting because it's not without a fee. Looking at the exact words. Yeah, without a fee. The question is if there's multiple interpretations, if there are more than one reasonable interpretation to language of a statute, then it is ambiguous. Then you look behind the language to see what the intent was. Was the intent ever to exempt from liability doctors, nurses, medical personnel working in hospitals providing care to patients? Was the intent ever to relieve them of liability for the care they gave if it was given negligibly? Just focusing on the four words. Emergency services without fee. They're combined. There's no comma. There's no separation. So the emergency services, that's a fee for the emergency services. There's no separation in between. There's a comma after good faith, and then it says provides emergency services without fee. Taking emergency services without fee, without fee directly applies to the emergency services provided. So you would have to look at it in that regard, and then was there a fee charged to the emergency services provided? No, there was not. There was no fee charged to the emergency services provided by Dr. Murphy in this case. All right. Anything further you want to add? If you have no other questions, I think I'm through. Thank you. All right. Ray, do you have a final word here? I have just three quick points. I just want to point out that services is nowhere mentioned in the language of the act. It's care, not services. I'm sorry. Emergency care. Yeah, care. Three quick points just to wrap up on our end. First of all, in the supplemental record, which was referred to in our reply brief, that C-170, Dr. Murphy was being paid between $125 to $140 per hour for the services he rendered, just so we have that clear. Number two, the case that was mentioned to you of Samoy, I'm not sure how that's spelled, versus Klein, that was not cited in the appellee's brief. I'm not familiar with that case because it wasn't cited. I'm not acknowledging that that case involved an emergency room physician. Some of the cases that we have cited, both sides have cited to the court, have involved emergency situations in a hospital, but none of them involve emergency room physicians. Does it matter? It involved a cardiologist. Well, my view is it doesn't matter. It doesn't matter that in the language there is no use of the word services, that the legislature chose to use the word care. Now, we're talking about services. That's what the whole discussion has been today, and yet the legislature never used any word like services. They chose care. Does it make a difference? Has anyone looked at what care meant as opposed to without fee, good care? There's no language about services in here. I think the absence of the word services, you know, having just a moment to think about that question, is the absence of that would go against the argument the appellees are making that there has to be a bill for specific services. I think that would logically weigh against that argument. That's the only response I can come with. That's a very good question. That's the best I can come up with. And the third thing I wanted to point out is that if there's any suggestion by the appellee that somehow in the legislative history there's some contrary language about what the intent of the statute was, I would point out that the language that we quoted, I don't think there's any other language in the legislative history that would support what's being argued to today. And there wasn't even a debate on this. This wasn't a debate where there were two sides where people were arguing about this. I believe that the quotes we gave you from the legislative history were from the sponsors of the bill as to what the intent of the bill was. This was not a debate. And I don't think we selectively gave you just, you know, that's the innuendo here, just the parts that helped us. I don't think, I think the legislative history is devoid of any intent that would support the argument that appellees argue today. And that's the only things I had to follow up on. If there's no further questions, I thank you all for your attention today. Well, the case was very well argued and very well briefed, and it will be taken under advisement. Thank you. All right.